Jeffrey Scott WOLFE, Plaintiff,

v.

Jo Anne B. BARNHART,
et al., Defendants.

No. 02–CV–749KC.

United States District Court,
N.D. Oklahoma.

Sept. 30, 2004.

es considered as well, the Court, upon independent review, sees no reason to depart from the recommendation. The Court thus concludes the Report should be affirmed in all respects.

Plaintiff's Amended Motion for Summary Judgment (Dkt. No. 48) is hereby DENIED and Defendant's Motion for Summary Judgment (Dkt. No. 27) is hereby GRANTED. IT IS THEREFORE ORDERED that Report and Recommendation (Dkt. No. 57) is hereby ADOPTED and AFFIRMED.

## REPORT AND RECOMMENDATION

CLEARY, United States Magistrate Judge.

This matter comes before the undersigned Magistrate Judge on the parties' cross-motions for summary judgment. The relevant pleadings are: Defendant's Motion for Summary Judgment, Statement of Material Facts and Brief in Support of Motion [Dkt. ## 27–29], Plaintiff's Response to Motion for Summary Judgment [Dkt. # 34], and Defendant's Reply [Dkt. # 41]. Also, Brief in Support of Amended Motion for Summary Judgment [Dkt. # 48], Response by Defendant [Dkt. # 43] and Plaintiff's Reply [Dkt. # 44].

This matter has been referred by the District Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). In connection with the parties' motions, a hearing was held on January 29, 2004, during which the Court heard oral argument and gave the parties an opportunity to provide supplemental authority for their positions.

For the reasons set forth below, the undersigned recommends that Plaintiff's Motion for Summary Judgment be *DENIED* and that Defendants' Motion for Summary Judgment be *GRANTED*.

Jeffrey Scott Wolfe, Broken Arrow, OK, pro se.

Karen A. Rivera, Susan K. Rudy, US Dept of Justice, Washington, DC, for Defendants.

### ORDER

KERN, District Judge.

Before the Court is the Report and Recommendation ("Report") (Dkt. No. 57) of the Magistrate Judge filed on March 17, 2004. Pursuant to FED. R. CIV. P. 72(b), the Plaintiff has timely objected to the Report. All dispositive issues have been accorded a *de novo* review in compliance with FED. R. CIV. P. 72(b). Such being completed, and all objections and respons-

## I. *Undisputed Facts* [1]

Defendants Jo Anne B. Barnhart and Social Security Administration (hereafter "SSA") filed Defendants' Statement of Material Facts on June 20, 2003. There is no dispute over the essential facts.

1. Plaintiff Jeffrey Scott Wolfe ("Wolfe") presently serves as an Administrative Law Judge ("ALJ") for the Office of Hearings and Appeals ("OHA") of the SSA in Tulsa, Oklahoma, a position he has held since October 15, 1995. Prior to his appointment as an ALJ, Wolfe served as United States Magistrate Judge for the U.S. District Court for the Northern District of Oklahoma from 1987 to 1995. (Administrative Record (hereafter, "AR") 310–18).

2. On September 22, 1999, Wolfe submitted a Request for Approval of Outside Activity to co-author a textbook on Social Security law and practice. (AR 321–23). Wolfe indicated he would be compensated for his work through royalties. He also indicated that his official duties were not related to the proposed book.

3. On November 6, 1999, the Chief ALJ at the Office of Hearings and Appeals granted Plaintiff permission to write the book, but told Wolfe he could not accept compensation because, pursuant to 5 C.F.R. § 2635.807(a), "federal employees are prohibited from receiving compensation from any source other than the Gov-

ernment for teaching, speaking, or writing that relates to official duties." (AR 319). Wolfe was informed:

> Because you are an Administrative Law Judge for Social Security and a text on social security law and practice deals in significant part on (sic) the Agency's policies, programs and operations, you may not accept compensation for this activity.

(AR 319).

4. On November 17, 1999, Wolfe submitted a request for reconsideration to OHA with additional personal and professional information. (AR 304–10). On March 2, 2000, the Chief ALJ at OHA affirmed his initial decision that Wolfe could write the book but could not receive compensation therefor. (AR 301–02).

5. Thereafter, Wolfe sought an advisory opinion from the Office of Government Ethics ("OGE") on the applicability of 5 C.F.R. § 2635.807—in particular the Note to § 2635.807(a)—to his proposed book. (AR 287–300). OGE concurred in the previous decisions rendered in the matter. (AR 251–54).

6. Marilyn L. Glynn, General Counsel for the OGE, informed Wolfe that the Note to § 2635.807(a)(2)(i)(E) did not apply because the book Wolfe was co-authoring did not deal generally with an area of

---

1. Plaintiff has asserted both a challenge to the administrative decision made by Social Security and a constitutional challenge to the ethics regulations adopted. Because of the different nature of these claims, the record reviewed is different. In assessing Plaintiff's challenge to the Defendants' administrative decision denying him compensation for writing his book, the Court is confined to the administrative record that was before the Defendants at the time of the decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The record reviewed in assessing Plaintiff's First Amendment challenge to the ethics regulatory scheme is broader. For example, Plaintiff's book was not part of the administrative record considered by the agency, and, therefore, cannot be considered by this Court when reviewing that administrative decision; however, it must be considered as part of the constitutional analysis to determine, among other things, whether the book addresses issues of public concern or merely personal interest. *E.g., Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

expertise, but a specific Social Security program.

Put simply, the note does not apply because, rather than being a general discussion of your professional expertise, the proposed work focuses specifically on a core mission of SSA.

(AR 254).

7. Wolfe was directed to Randolph W. Gaines, Social Security Administration's Designated Agency Ethics Official and Deputy General Counsel, for a final determination of the matter. (AR 249).

8. On May 28, 2002, Wolfe asked SSA to reconsider its opinion a second time. (AR 12–120 & 121–232) Wolfe appended to his submission various correspondence and documents, including Social Security Orders, Judgments and Reports and Recommendations he authored as a U.S. Magistrate Judge. On July 29, 2002, Gaines denied Wolfe's request to receive royalties on the book, finding that the text would deal with an "ongoing or announced policy, program or operation of the agency." (AR 1–3). Gaines adopted Glynn's analysis that the proposed book dealt specifically with a "core mission of SSA", therefore it related to Wolfe's official duties and compensation was not permissible. (AR 2–3).

9. *Social Security Disability and the Legal Professional,* authored by Wolfe and Lisa Proszek, was published by Delmar Publishers in July 2002.

10. On September 27, 2002, Wolfe filed this lawsuit asking that the Court declare the rules of the Ethics in Government Act unconstitutional as applied and reverse SSA's decision denying Wolfe compensation for his book.

11. Wolfe contends that the decision of the SSA is (1) contrary to law because enforcement of the provision was enjoined by the U.S. District Court for the District of Columbia; (2) arbitrary and capricious because it ignores application of the Note to 5 C.F.R. § 2635.807(a) permitting compensation for writing under certain circumstances [2]; and, (3) unconstitutional because the regulatory scheme impermissibly burdens Wolfe's First Amendment right of free speech. Defendants assert that application of the regulation to Wolfe was not arbitrary and capricious, and that the provision is constitutional and narrowly tailored to serve a legitimate governmental interest.

## II. Standard of Review

Wolfe challenges the administrative decision of the SSA on two grounds. First, that the decision is contrary to law, and second, that it is arbitrary and capricious. Wolfe also asserts that the OGE regulatory scheme violates his rights under the First Amendment. Because the standard of review for Wolfe's administrative challenge differs from the standard of review for his constitutional claim, these issues are addressed separately below.

### A. Review of the Agency's Administrative Action

Chapter 7 the Administrative Procedures Act ("APA"), 5 U.S.C. § 551, *et seq.,* provides for judicial review of agency action. The APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

---

**2.** The Note provides:

Section 2635.807(a)(2)(i)(E) does not preclude an employee, other than a covered noncareer employee, from receiving compensation for teaching, speaking or writing on a subject within the employee's discipline or inherent area of expertise based on his educational background or experience even though the teaching, speaking or writing deals generally with a subject within the agency's areas of responsibility.

provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be -

 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 (B) contrary to constitutional right, power, privilege, or immunity....

5 U.S.C. § 706(2)(A) & (B).

■ Wolfe's claim that SSA's decision was arbitrary and capricious is brought under the APA and must be evaluated against the administrative record. Plaintiff bears the burden of proving that Defendants' action was arbitrary and capricious. *AllCare Home Health, Inc. v. Shalala,* 278 F.3d 1087, 1089 (10th Cir. 2001).

■ A decision is arbitrary and capricious if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Review of agency action under this standard is narrow and substantial deference is afforded to the actions of administrative agencies in performance of their obligations. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Smith v. Scott,* 223 F.3d 1191, 1195 (10th Cir.2000); *Santa Fe Energy Products Co. v. McCutcheon,* 90 F.3d 409, 413 (10th Cir.1996).

■ A narrow scope of review acknowledges the expertise of the administrative tribunal and helps promote uniform application of agency rules. *Squaw Transit Co. v. U.S.,* 402 F.Supp. 1278, 1287 (N.D.Okla.1975). Administrative determinations may be set aside only for substantial procedural or substantive reasons and the reviewing court may not substitute its judgment for that of the agency. *Utahns for Better Transp. v. U.S. Dept. of Transp.,* 305 F.3d 1152, 1164 (10th Cir.2002), *modified in part,* 319 F.3d 1207 (10th Cir.2003). An agency's interpretation of its own regulation is accorded controlling weight unless that interpretation is plainly erroneous or inconsistent with the regulation. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Farmers Telephone Co., Inc. v. F.C.C.,* 184 F.3d 1241, 1247–48 (10th Cir. 1999). The court's task is not to decide which among several interpretations it finds best serves the regulatory purpose. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988).

**B. Review of the Regulation's Constitutionality.**

■ Wolfe asserts that 5 C.F.R. § 2635.807 as applied to him presents an unconstitutional violation of his First Amendment right of free expression. Authority to determine Plaintiff's claim that the ethics act is unconstitutional as applied here is independent of the APA and requires an independent assessment of the facts and law. *Commercial Drapery Contractors, Inc. v. United States,* 967 F.Supp. 1, 3 (D.D.C.1997), *aff'd,* 133 F.3d 1

(D.C.Cir.1998); *Rydeen v. Quigg,* 748 F.Supp. 900, 905–06 (D.D.C.1990), *aff'd,* 937 F.2d 623 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992). This is a *de novo* review. *Hill v. National Transp. Safety Bd.,* 886 F.2d 1275, 1278 (10th Cir.1989).

◼ In conducting this constitutional review, the court must make an independent examination of the record in order to ensure that the decision "does not constitute a forbidden intrusion on the field of free expression." *Schalk v. Gallemore,* 906 F.2d 491, 494 (10th Cir.1990). The court must first decide whether the expression at issue was made by one speaking as a citizen upon a matter of public concern or as an employee upon a matter of only personal interest. *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. If the matter is one of public concern, the court must then balance the interests of the employee as a citizen in commenting upon matters of public concern and the Government, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, because the regulation at issue here operates as a prior restraint on a broad range of expression, the Government must also show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation of the government." *U.S. v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)[3] (citing *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731); *Arndt v. Koby,* 309 F.3d 1247, 1251 (10th Cir.2002), *cert. denied,* 538 U.S. 1013, 123 S.Ct. 1936, 155 L.Ed.2d 850 (2003); *Belcher v. City of McAlester, Oklahoma,* 324 F.3d 1203, 1206 n. 3.

## III. Plaintiff's Challenge to the Agency's Administrative Decision

Plaintiffs asserts two bases for challenging the action of the Social Security Administration. First, the agency's action was not in accordance with the law. Second, the decision was arbitrary and capricious. These challenges are addressed separately below.

### A. The Agency's Action was in Accordance with Law

◼ Plaintiff contends that the SSA's action was not in accordance with the law because enforcement of 5 C.F.R. § 2635.807(a) was enjoined by decision of the United States District Court for the District of Columbia. *Sanjour v. U.S. E.P.A.,* 7 F.Supp.2d 14 (D.D.C.1998), *on remand from Sanjour v. Environmental Protection Agency,* 56 F.3d 85 (D.C.Cir. 1995). Plaintiff contends that in *Sanjour* the district court enjoined enforcement of § 2635.807(a) against the OGE and all federal employees below the level of the Senior Executive Service. Defendants argue that Plaintiff has misread the breadth of the injunction entered and that, in any event, the regulation at issue has now been amended to comply with the ruling in *Sanjour.*

*Sanjour* involved a First Amendment challenge to the prohibition in 5 C.F.R. § 2635.807(a) regarding employee acceptance of travel expense reimbursement in connection with unofficial teaching, speaking and writing relating to an employee's official duties. Section 2635.807(a) provides that with certain exceptions Govern-

---

3. The district court, appeals court and Supreme Court decision in *National Treasury Employees Union* are cited hereafter as *"NTEU"* followed by the appropriate reporter citation.

ment employees could not receive compensation "from any source other than the Government for teaching, speaking or writing that relates to the employee's official duties." The regulation defined "compensation" as including "transportation, lodgings and meals, whether provided in kind, by purchase of a ticket, by payment in advance or by reimbursement after the expense has been incurred." 5 C.F.R. § 2635.807(a)(2)(iii). Plaintiffs contended that the regulation, in conjunction with ethics policies of the Environmental Protection Agency ("EPA"), infringed their First Amendment rights.[4] *See, Sanjour,* 786 F.Supp. 1033, 1035–36 (D.D.C.1992).

Plaintiffs in *Sanjour* sued alleging infringement of their First Amendment rights. The district court initially rejected Plaintiffs' claims, 786 F.Supp. 1033 (D.D.C. 1992), as did the Court of Appeals, 984 F.2d 434 (D.C.Cir.1993). However, in an *en banc* rehearing, the Court of Appeals sustained the First Amendment challenge and held the regulatory scheme invalid. *Sanjour,* 56 F.3d at 88. On remand, the District Court entered an injunction "against the enforcement of restrictions placed on reimbursement for reasonable non-official travel expenses as prohibited on page 3 of EPA Ethics Advisory 91–1 and under 5 C.F.R. § 2635.807(a) & § 2636.202(b) and a judgment declaring

the unconstitutionality of the entire scheme." *Sanjour,* 7 F.Supp.2d at 21.[5]

In response to the *Sanjour* decision, on December 31, 2001, the OGE amended § 2635.807(a) by excluding from the definition of compensation "travel expenses, consisting of transportation, lodgings or meals, incurred in connection with the teaching, speaking or writing activity."[6] 5 C.F.R. § 2635.807(a)(2)(iii)(D). OGE noted:

> [T]he purpose of the amendment was to bring § 2635.807(a) into conformity with the May 30, 1995, decision by the United States Court of Appeals for the District of Columbia Circuit in *Sanjour v. Environmental Protection Agency,* 56 F.3d 85 (en banc), as clarified in the April 14, 1998, decision on remand by the United States District Court for the District of Columbia, 7 F.Supp.2d 14 (D.D.C.1998).

*Standards of Ethical Conduct for Employees of the Executive Branch, Supplementary Information,* 66 Fed.Reg. 59673 (Nov. 30, 2001).

The undersigned concludes that the injunction issued by the District Court in *Sanjour* was directed at a regulatory scheme that involved more than the regulation at issue in this case. The additional component of the *Sanjour* regulations permitted employees to accept reimbursement

---

4. While § 2635.807(a) generally bars reimbursement for expenses incurred in connection with speech regarding one's official duties, the regulatory scheme at issue in *Sanjour* permitted reimbursement for "authorized" speaking engagements while denying reimbursement for speech that the agency did not approve. *Sanjour,* 56 F.3d at 88–89. Thus, reimbursement depended on the content of the speech, creating the appearance that employees "may receive private reimbursement for travel costs necessary to disseminate their views only by toeing the agency line." *Id.* at 96–97.

5. The District Court's opinion states that "[a]n injunction against the enforcement of 5

C.F.R. § 2635.807(a) in its entirety is necessary to provide plaintiffs with complete relief." *Sanjour,* 7 F.Supp.2d at 18. Consequently, Plaintiff contends that SSA may not enforce any provision of § 2635.807(a). The undersigned disagrees. *Sanjour* clearly concerned a specific issue—reimbursement of travel expenses for unofficial writing, teaching or speech. Notwithstanding the district court's broad language, its Order focused on this specific concern.

6. The exclusion only applied to employees holding positions classified as GS–15 or below. *See,* 5 C.F.R. § 2636.303(a).

for travel expenses to make a speech if their agency approved of their message. This is impermissible, content-based discrimination that is not present in the regulation at issue here. Furthermore, the part of § 2635.807(a) that was at issue in *Sanjour* has been amended to bring it into compliance with the court's directive and cure the constitutional defects identified in that decision. Thus, the regulation now before this Court is not the same regulation found invalid by the *Sanjour* court. The undersigned concludes that enforcement of 5 C.F.R. § 2635.807 in its present form is not enjoined by *Sanjour*, and, in any event, the injunction entered in *Sanjour* was limited to the travel expense reimbursement under a different regulatory scheme than is presented here. Accordingly, the SSA's action with respect to Plaintiff's application to receive book royalties accords is in accordance with applicable law.

### B. Defendants' Decision Is Not Arbitrary and Capricious

■ Plaintiff next asserts that the action of the Social Security Administration in denying him the right to receive royalties for his book is arbitrary and capricious. Plaintiff bears the burden on this issue. *AllCare*, 278 F.3d at 1089. The arbitrary and capricious standard has been equated to the substantial evidence test. *Northwest Pipeline Corp. v. F.E.R.C.*, 61 F.3d 1479, 1485 (10th Cir.1995). Plaintiff contends Defendants' action is arbitrary and capricious because it failed to consider his "inherent expertise" within the context of the Note to § 2635.807(a). Plaintiff contends that this Note provides an exception to the general regulatory ban on Government employees receiving compensation from any non-Government source for writing relating to his or her official duties. 5

C.F.R. § 2635.807(a). He argues that his situation falls under this Note because his service for eight years as a U.S. Magistrate Judge and his teaching experience gave him "inherent expertise" in Social Security disability law and, thus, *exempts* him from the compensation ban.

Defendants contend that the Note is *not* an exemption to the broad compensation ban contained in § 2635.807, but merely provides "interpretive guidance" to agencies by clarifying that the outer bounds of the nexus requirement between the employee's speech and his official duties does not reach activities that are so general as to eliminate any meaningful connection to an employee's official duties. [Defendants' Response Dkt. # 43, p. 14–15]. Defendants contend that the Note has no application here because the speech at issue relates *specifically* to the employee's official duties and SSA operations, and, therefore, is not a general discussion of the Plaintiff's area of expertise.

Plaintiff contends that Defendants have misconstrued the Note by misreading what the word "generally" refers to. Defendants contend the word "generally" refers to the employee's expressive activity, *i.e.*, the employee may write *generally* about matters related to the agency's area of responsibility. Plaintiff contends that "generally" refers to the *agency's* activities, not the employee's. Plaintiff's reading is clearly wrong. As used in the Note, "generally" is an adverb modifying the verb "deals." Plaintiff's reading is ungrammatical and incorrect.

There is little doubt that the language in the Note and the examples following are less than clear, and in responding to Plaintiff's inquiries, various agency officials disagreed repeatedly as to which of the examples following the Note best applied to Plaintiff's situation.[7] The agency reviewed

---

7. The Note to § 2635.807(a)(2)(i)(E) is followed by nine examples of cases affected by

the Note. In his letter of March 2, 2000,

Plaintiff's application for permission to receive compensation for his book and interpreted its regulations as prohibiting such compensation. It is not this Court's function to decide that a different interpretation of the regulation might better serve the agency's purpose. The agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). This Court must defer to the agency's interpretation unless an alternative reading "is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Gardebring*, 485 U.S. at 430, 108 S.Ct. 1306. Since an alternative interpretation of the regulation is not "compelled" here, this Court must defer to the agency's reading of the Note and its inapplicability to Plaintiff's situation. Accordingly, the undersigned concludes that the administrative decision herein was not arbitrary and capricious.

### IV. Plaintiff's First Amendment Claim

▉▉▉ Plaintiff seeks a declaratory judgment that the ethics rules promulgated by the OGE and set forth in 5 C.F.R. § 2635.807 violate the First Amendment to the U.S. Constitution because the denial of compensation for writing his book places an impermissible burden on his right of free expression.[8]

▉▉▉▉▉ It is well-established that Congress may impose restraints on the job-related speech of public employees that would be unconstitutional if applied to the general public. *NTEU*, 513 U.S. at 465, 115 S.Ct. 1003; *Snepp v. U.S.*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). *Pickering* sets out the fundamental test. The key is to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

The *Pickering* test is essentially a two-pronged analysis: First the court must determine whether the speech at issue involves matters of public concern. If so, then the court must weigh the interest of the employee in freedom of speech and the State's interest in preventing disruption to the public service it seeks to deliver. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *Connick*, 461 U.S. at 142, 103 S.Ct. 1684; *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

Plaintiff's First Amendment challenge rests largely on the *NTEU* and *Sanjour* decisions. In *NTEU*, the Supreme Court struck down an ethics regulation that prohibited Government employees from receiving honoraria for teaching, speaking or writing on *any* topic—whether related to their official Government duties or not.[9]

---

Charles R. Boyer cited Example 4 to the Note. (AR 301). Marilyn L. Glynn, in her letter of November 13, 2001, suggested an example to the preamble to the Standards of Ethical Conduct for Executive Branch Employees and Example 5 to the Note as most relevant. (AR 252 & 253). In his July 29, 2002, letter rendering a final determination of the matter, Randolph Gaines cited Example 2 to § 2635.807(a)(3) as also relevant, although he noted that the example was "intended as an illustration of a different point." (AR 2).

8. At the January 29, 2004, hearing, Plaintiff stated that his agreement with the publisher called for a $500 advance, $500 to be paid upon completion of the book, and royalties thereafter. Plaintiff estimated the total sum due to be approximately $1,300.

9. The provision at issue, 5 U.S.C. app. § 501(b) (1989), provided:

An individual may not receive any honorarium while that individual is a Member [of Congress], officer or employee [of any of

In most, but not all, cases presented in *NTEU* the Petitioners were Government employees speaking or writing on topics that had absolutely no connection to their official duties.[10]

The District Court held the regulation unconstitutional, finding that it was not properly limited to meet the Government's concern that an honorarium paid to a Government employee for a speech was, in reality, "payment for some occult benevolence the speaker was in a position to bestow." *NTEU*, 788 F.Supp. at 10. The court found the regulation over-inclusive because payment for a speech or article was proscribed "even where there is neither the possibility nor a perception that the office and the payment are interdependent." *Id.* The Court of Appeals affirmed, holding the regulation overbroad because it required no nexus "between the employee's job and either the subject matter of the expression or the character of the payor." *NTEU*, 990 F.2d at 1275. In affirming, the Supreme Court established a new, modified balancing test to determine the constitutionality of Government restrictions that amount to a prior restraint on the free expression of Government employees. In such cases:

> The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government. *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003. *See Arndt*, 309 F.3d at 1251–52 ("In such a case involving a prior restraint of employee speech, while the *Pickering/Connick* balancing test applies, it is modified [to the *NTEU* test].")[11]

This *NTEU* test places a significantly greater burden on the Government to justify restrictions on public employees' free speech when the restriction is in the nature of a prior restraint on a broad range of expression. Indeed, one commentator has said of the *NTEU* decision, "In the First Amendment context, at least, the Court may have constructed a balancing test that the government can almost never win."[12]

*NTEU* distinguished between "*post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities," *NTEU*, 513 U.S. at 467, 115 S.Ct. 1003, and an *ex ante* analysis of a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* The court said that the widespread nature of the honoraria ban and its chilling effect on potential speech "gives rise to far more serious concerns

the three branches of the federal Government].

10. For example, dance reviews done for radio and television by a microbiologist with the Food and Drug Administration. *NTEU*, 513 U.S. at 461, 115 S.Ct. 1003.

11. In *Arndt* the court never reached the second prong of the *NTEU* test because the first requirement was not met—Plaintiff's expression addressed purely personal, not public, concerns. *Arndt*, 309 F.3d at 1252–53.

12. George D. Brown, *The Constitution as an Obstacle to Government Ethics—Reformist Legislation After National Treasury Employees Union*, 37 Wm. & Mary L.Rev. 979, 982 (Spring 1996). Prof. Brown notes a "fundamental difference" between the individualized nature of the determinations in *Pickering* post hoc discipline cases and the generalized, prospective restriction on speech at issue in *NTEU*. "Despite the Court's insistence that *Pickering* could simply be transposed to the latter context, the presence of a generalized ban triggered some basic First Amendment concerns and principles, even though the language of balancing partially concealed them." *Id.* at 994. The result, Prof. Brown notes, was that the court's usual deference to congressional action in this area "was relegated to a secondary role." *Id.*

than could any single supervisory decision." *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003. Therefore, the court required that the Government satisfy a far greater burden in order to justify such a broad prophylactic regulation.

*Sanjour* employed the *NTEU* test in a slightly different context. In *Sanjour* employees of the EPA were denied reimbursement for travel expenses to make speeches about matters relating to their official duties; however, another section of the regulatory scheme permitted reimbursement if the activities were approved by the employee's agency. The Court noted that this made it appear that "employees may receive private reimbursement for travel costs necessary to disseminate their views only by toeing the agency line." *Sanjour*, 56 F.3d at 96–97. Applying the *Pickering/NTEU* balancing test, the court found the regulatory scheme invalid on multiple grounds. *Id.* at 93–99.

The instant case is similar to *NTEU* in that it involves a broad *ex ante* ban on compensation for certain teaching, speaking or writing; however, this case presents a nexus between the employee's speech and the employee's official duties that was lacking in *NTEU*. The instant case is similar to *Sanjour* in that it concerns expressive conduct related to a Government employee's official duties; however, unlike *Sanjour*, here there is no issue of the Government permitting compensation based on agency approval of the content of the speech.

### A. Wolfe's Book Address a Matter of Public Concern.

 The first question posed by the *NTEU* test is whether the speech at issue addresses matters of public concern.

There is little question that this prong is satisfied here. The test is whether the expression can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. It is not sufficient that the matter be of general interest to the public, what is *actually* said must meet the public concern threshold. *Schalk*, 906 F.2d at 495 (citing *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 769 (10th Cir.1984)). The speech must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government." *Wilson*, 732 F.2d at 768.

In the instant case, Plaintiff's book is an instructional text published as part of the West Legal Studies Series. It is designed "to help those unfamiliar with the process make their way through the heart of disability adjudication: the administrative hearing before a federal Administrative Law Judge." [Dkt. # 24, Exhibit 3 to Objection and Motion to Complete and Supplement the Administrative Record, p. xii (Delmar Learning 2003) ].

The importance of such a work to the public appears obvious. Agency officials estimate that Social Security ALJs conduct more than 500,000 disability hearings per year and the SSA paid approximately $90 billion in disability benefits in fiscal 2001. The issue of expediting hearings on these claims has been a topic of Congressional hearings and debate.[13] Thus, the undersigned finds that the first prong of the *NTEU* test is satisfied.

### B. Weighing the Competing Interests.

 Once it is established that the expression at issue involves a matter of

---

**13.** *See, for example,* the Testimony of Larry G. Massanari, Acting Commissioner of the Social Security Administration, before the House Ways and Means Committee's subcommittee on Social Security Disability Program's Challenges and Opportunities. *http://www.ssa.gov/legislation/testimony 062801.html* (accessed January 8, 2004).

public concern, the burden shifts to the Government to show that its interests outweigh the employee's First Amendment interests. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003. Only the Government's employment interests are considered in this balancing test. As the court noted in *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir.1998): "[T]he only state interest acknowledged by *Pickering* and its progeny, which may outweigh the right of state employees to speak on matters of public concern, is the State's interest 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" To justify its ban on compensation for speech related to a Government employee's official duties, the Government must show that the employee's speech interests and that of his audience are outweighed by the speech's impact on the actual operation of the Government.

### 1. The Government's Claimed Interest.

The Government claims that the regulation at issue maintains the public's confidence in the integrity of public employees and avoids the appearance of impropriety caused by allowing public office to generate private gain. Courts have long recognized the validity of these interests. Indeed, Justice Stevens, writing for the Court in *NTEU* described as "undeniably powerful" the Government's concern that federal employees not appear to misuse power by accepting compensation for their unofficial and nonpolitical writing activities. *NTEU*, 513 U.S. at 472, 115 S.Ct. 1003. There is no question that Congress

has the constitutional authority and obligation to promote the integrity of, and popular confidence in, the federal government. *NTEU*, 788 F.Supp. at 9. Cf. *Federal Election Comm'n v. National Right to Work Committee*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("The governmental interest in preventing both actual corruption and the appearance of corruption of elected representatives has long been recognized.").[14] The Supreme Court has noted that "[A] democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). Accordingly, it has been held that "Congress appropriately enacts prophylactic rules that are intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States." [15] *Crandon v. United States*, 494 U.S. 152, 164, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). As support for its position that the ban on compensation is necessary, Defendants offer the General Accounting Office's Report to the Chairman, Subcommittee on Federal Services, Post Office and Civil Service, Committee on Governmental Affairs, U.S. Senate entitled *Employee Conduct Standards: Some Outside Activities Present Conflict–of–Interest Issues* (February 1992). The Report concluded that the risk of conflict-of-interest "is increased when employees engage in outside activities that

---

14. For a short history of Government conflict of interest regulation, *see* Beth Nolan, *Public Interest, Private Income: Conflicts and Control Limits on the Outside Income of Government Officials*, 87 Nw. U.L.Rev. 57, 62–70 (Fall 1992).

15. Commentators have noted the difficulty in applying an "appearance standard" for ethical conduct. *See generally*, Peter W. Morgan, *The Appearance of Propriety: Ethics Reform and the Blifil Paradoxes*, 44 Stan. L.Rev. 593 (February 1992).

are related to the agency's mission and operations." *Id.* at 13.[16]

## 2. Wolfe's Interest and that of the Public.

Weighed against this governmental interest are the interests of "present and future employees" in a broad range of inhibited "present and future expression" as well as the interests of their "potential audiences." *NTEU,* 513 U.S. at 468, 115 S.Ct. 1003. Section 2635.807 does not prohibit any speech outright, and does not discriminate against speakers based on their viewpoint; nevertheless, the prohibition on compensation imposes a significant burden on expressive activity. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *NTEU,* 513 U.S. at 469, 115 S.Ct. 1003. This also imposes a "significant burden on the public's right to read and hear what the employees would otherwise have written and said." *Id.* at 470, 115 S.Ct. 1003. The importance of Plaintiff's writing—at least to that segment of the public practicing Social Security disability law—is great. Government employees such as the Plaintiff are in a position to offer the public "unique insights into the workings of government generally and their areas of specialization in particu-

lar" *Sanjour,* 56 F.3d at 94 (citing *Pieczynski v. Duffy,* 875 F.2d 1331, 1334 (7th Cir.1989)).

Two factors reduce the weight to be accorded the employee's side of the scale, however. First, because the restriction is an indirect financial disincentive to speak rather than an outright ban on employee speech, the interest on the employee side of the scale is less weighty than it would otherwise be. *NTEU,* 990 F.2d at 1273 (financial character of limitation affects the weight of the employee's interest in the balancing test).

Second, less weight is given the employee interest where the restriction bars the employee from earning *profits* on his speech rather than receiving reimbursement for expenses necessary to engage in the expressive activity. *Sanjour,* 56 F.3d at 93–94 (noting that by denying employees the ability to recover expenses necessary to engage in speech, the ban imposed a greater impediment to publicizing their views than the honoraria ban in *NTEU* ). *See also NTEU,* 990 F.2d at 1285–86 (Santyelle, J., dissenting) (the honorarium ban "only prevents employees from *profiting* from their outside activities"). Here, Plaintiff seeks the right to compensation in the form of royalties earned by sales of his book, not reimbursement of necessary expenses.[17] (AR 321) Thus for these two reasons, the employee/public interests are

---

**16.** In *NTEU,* the Court found this report insufficient to support an honorarium ban because its conclusions and recommendations "dealt exclusively with the problems of outside activities 'that were focused specifically on the agencies' responsibilities and/or related directly to the employees' duties.' " *NTEU,* 513 U.S. at 472 n. 18, 115 S.Ct. 1003. In *NTEU,* the primary focus of the Court's decision was the fact that the honorarium ban applied to expression wholly *unrelated* to the employees' job. In this case, however, the prohibition is expressly limited to expression directly related to Plaintiff's official duties.

**17.** See footnote 8, *supra.* Plaintiff has categorized as "royalties" the compensation he is seeking to receive. (AR 321). Royalties are a form of income or profit and are expressly covered by the regulation at issue. "Compensation includes any form of consideration, remuneration or income, *including royalties,* given for or in connection with the employee's teaching, speaking or writing activities." 5 C.F.R. § 2635.807(a)(2)(iii) (emphasis added).

accorded less weight than the Government's interest.

### C. The Regulation is 'Narrowly Tailored' to Meet Its Goal

The *NTEU* balancing test supports a finding of constitutionality; however, the Court's inquiry does not end there. The regulation may still be found flawed if it is "overbroad" or is not narrowly tailored to meet the governmental goal. *NTEU*, 990 F.2d at 1274. The Government contends that the regulation is narrowly tailored because its application is limited to expression connected to the employee's official duties. Defendants argue that this "nexus" restriction saves the regulation from the problems that plagued the regulatory scheme in *NTEU*. Defendants also contend that the regulation at issue is viewpoint-neutral—that is, it does not distinguish between speech approved by the agency and unauthorized speech—and, therefore, it also avoids the problem that undermined the regulatory scheme in *Sanjour.*

Plaintiff contends that the regulation is not narrowly tailored and notes that in this instance the regulatory scheme allows him to receive compensation for teaching a course in Social Security disability law at the University of Tulsa College of Law, but prohibits him from receiving compensation for writing the text book he uses in teaching the law school class.

▮ The doctrines of overbreadth and narrow tailoring invalidate a regulation that imposes substantial burdens that are not supported by the statute's legitimate goals. In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Court noted that where conduct and not merely speech is involved, "we believe that the overbreadth of a statute

must not only be real but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. 2908. In *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the court discussed the test for narrow tailoring:

> "[T]he requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Id.* at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

▮ The regulation may not burden "substantially more speech than necessary to further the Government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance it goals." *Id.*

The instant case avoids the problems presented in *NTEU* and *Sanjour*. Unlike *NTEU*, the regulation at issue is limited to speech related to Plaintiff's official duties. While the Court in *NTEU* declined to impose a nexus requirement on the challenged regulation, the opinion indicates tacit approval for such a limitation.[18] In addition, Justice O'Connor clearly felt that imposing a nexus requirement would have cured the constitutional defect. *NTEU*, 513 U.S. at 485–86, 115 S.Ct. 1003 (O'Connor, J., concurring in judgment in part and dissenting in part) ("I see no reason why the nexus principle underlying this general provision cannot serve as the appropriate remedial line.") Furthermore, Chief Justice Rehnquist, joined by Justices Scalia and Thomas, also clearly feel that restrictions on employee speech would be per-

---

18. "Congress' decision to provide a total exemption for all unrelated series of speeches undermines application of the ban to individual speeches and articles with no nexus to

Government employment. Absent such a nexus, no corrupt bargain or even appearance of impropriety appears likely." *NTEU*, 513 U.S. at 474, 115 S.Ct. 1003.

missible if a nexus existed between the employee's speech and his Government employment:

> There is little doubt that Congress reasonably could conclude that its interests in preventing impropriety and the appearance of impropriety in the federal work force outweigh the employees' interests in receiving compensation for expression that has a nexus to their Government employment.

*Id.* at 495, 115 S.Ct. 1003 (Rehnquist, C.J., dissenting, joined by Scalia, J. and Thomas, J.).

Commentators have also recognized a nexus requirement as a reasonable limitation supporting the validity of an ethics regulation on outside income. For example, Professor Nolan identified two principles underlying Government restrictions on outside income: (1) preventing conflicts of interest that may adversely affect the conduct of Government business, and (2) maintaining control of Government operations. Nolan, 87 Nw. U.L.Rev. at 60. After examining various ethics regulatory schemes, Prof. Nolan concluded such regulations are justified by the principles of conflicts and control where there was a nexus between the employee's speech and his Government work. *Id.* at 144–47. Prof. Nolan concluded:

> Outside income that is intended to compensate for government services or is otherwise related to a government position, as well as outside income from sensitive sources, may be prohibited, whatever its label, source or form, and whenever it is offered or accepted. Other outside income, however, is the government employee's to earn or receive,

and may be prohibited only under the most unusual circumstances. In this way, we protect the public interest in a government that is free of improper conflicts, controlled by those with proper authority within the public sphere, and served not by Plato's philosopher kings, but by citizens who share in the life of the country.

*Id.* at 147.

As Plaintiff points out, this case presents an anomalous situation in which Social Security has approved Plaintiff to receive compensation for teaching a course at the University of Tulsa law school on disability law, but has denied his request to receive royalties for writing the text used in that course. The ABA Committee on Government Standards recognized this very possibility in its 1993 report on Government ethics regulations.[19] Plaintiff argues that this situation demonstrates that the regulation barring compensation for his book is overinclusive and, thus, unconstitutional. The undersigned does not agree.

First, courts have given greater deference to Government regulation in this area when the Government acts as employer than when it acts as sovereign. *Waters,* 511 U.S. at 673, 114 S.Ct. 1878 ("[W]e have consistently given greater deference to government predictions of harm that are used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.") *NTEU* did not alter this pattern of deference.

Second, although Plaintiff argues the regulatory scheme unreasonably discrimi-

19. ABA Committee on Government Standards, *Keeping Faith: Government Ethics & Government Ethics Regulation,* (Cynthia Farina, Reporter), 45 Admin. L.Rev. 287 (1993). The report noted that existing ethics regulations would deny royalties to a National Highway Transportation Safety Administration employee for publishing a consumer safety guide on automobiles, but apparently would permit the same employee to receive compensation for teaching a course on automobile crashworthiness using the same information contained in his book. *Id.* at 321 (citing Example 3 to 5 C.F.R. § 2635.807(a)(2)(i)(E)).

nates on the basis of the *form* of communication—*i.e.*, oral teaching versus writing—the agency's distinction is properly based on the nature of the *payor* involved. In evaluating the nexus between an employee's speech and his official duties, one consideration is the identity of the party paying compensation for the speech. For example, if the payor is an entity that may have an interest in official matters involving that employee, an obvious conflict arises. See 5 C.F.R. § 2635.807(a)(2)(i)(C). The ethics regulation at issue here contains a specific exception for certain teaching:

Notwithstanding that the activity would relate to his official duties under paragraphs (a)(2)(i)(B) or (E) of this section, an employee may accept compensation for teaching a course requiring multiple presentations by the employee if the course is offered as part of:

(i) The regularly established curriculum of:

(A) An institution of higher education as defined at 20 U.S.C. 1141(a);

(B) An elementary school as defined at 20 U.S.C. 2891(8); or

(C) A secondary school as defined at 20 U.S.C. 2891(21); or

(ii) A program of education or training sponsored and funded by the Federal Government or by a State or local government which is not offered by an entity described in paragraph (a)(3)(i) of this section.

5 C.F.R. § 2635.807(a)(3)(i)-(ii).

The purpose of this exception is "to permit compensation for teaching sponsored by recognized educational institutions and government entities." *Standards of Ethical Conduct for Employees of the Executive Branch,* 57 Fed.Reg. 35006, 35039, 1992 WL 187981 (August 7, 1992). The agency considered a parallel exemption for compensation for writing a book related to an employee's officials duties, but concluded:

There does not appear to be any compelling reason to treat books or chapters of books differently than any other form of writing. Moreover, because there are no generally accepted standards for distinguishing between scholarly and other writings, an exception for scholarly writings would be difficult to implement.

*Id.*

The agency here reasonably carved out an exception to the prophylactic rule for teaching conducted at a bona fide educational institution. The agency considered, and reasonably concluded, that a similar exception for writing would be too difficult to administer. Furthermore, the agency could reasonably conclude that any potential conflict would be greatly lessened or eliminated where the payor was a recognized educational institution, but that the same might not be true where a myriad of private publishing companies were concerned. The Government must be afforded reasonable administrative flexibility in handling such a program. Case-by-case ethics determination is not a reasonable solution. "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters,* 511 U.S. at 675, 114 S.Ct. 1878.

While it may appear reasonable that an exception similar to that for teaching would also apply to writing for an educational book publisher, it is not the court's function to override the agency's ethics rules or their interpretation to better fit the court's view of the matter.

## V. Conclusion

For the reasons set forth herein, the undersigned finds that the decision not to

1244

permit Plaintiff, a Social Security ALJ, to receive compensation in the form of royalties for writing a book on Social Security disability law is neither contrary to law nor arbitrary and capricious. The undersigned further finds that under the balancing tests set forth in *Pickering and NTEU*, the ethics regulation upon which Defendants' decision is based does not impose an impermissible restriction on Plaintiff's First Amendment rights.

For these reasons the undersigned **RECOMMENDS** that the Plaintiff's Motion for Summary Judgment be **DENIED** and the Defendants' Motion for Summary Judgment be **GRANTED**.

## *OBJECTIONS*

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of his review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so within ten days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. United States,* 950 F.2d 656 (10th Cir.1991); and *Talley v. Hesse,* 91 F.3d 1411, 1412–13 (10th Cir.1996).